**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES ex rel. STEPHEN HEADEN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 4:16-CV-1164-VEH |
| ADAMS AND ASSOCIATES, INC., d/b/a THE GADSDEN JOBS CORPS CENTER; LORRAINE LANE; and SHAILEEN VIERA, | ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

On July 14, 2016, the Plaintiff-Relator, Stephen Headen, filed this action against Adams and Associates, Inc. d/b/a the Gadsden Jobs Corps Center ("Adams"), Lorraine Lane, Juvenel Levros, and Shaileen Viera to recover, on behalf of the United States, damages and civil penalties arising from false statements and claims allegedly made by the Defendants in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729–3733, as amended ("the Act" or the "FCA"). (Doc. 1). On November 18, 2016, the government filed its notice of non-intervention. (Doc. 9). Thereafter, Levros was terminated as a defendant when the Relator filed an Amended Complaint which made no

claims against Levros. (Doc. 41).

The Amended Complaint, which is now the operative pleading, alleges that all Defendants are liable for: "Substantive Violations of the False Claims Act" (Count One); "Implied False Certification in Violation of the False Claims Act" (Count Two); and conspiracy to violate the False Claims Act (Count Three).[1] The case comes before the Court on the Defendants' Motion to Dismiss (the "Motion"). (Doc. 45). For the reasons stated herein, the Motion will be **GRANTED**.

## II.    LEGAL PRINCIPLES

The Defendants state that their motion is brought "pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6)." (Doc. 45 at 1). The Eleventh Circuit Court of Appeals has stated:

> Rule 9(b) applies in FCA cases. *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308–09 (11th Cir.2002). An FCA complaint must therefore "state with particularity the circumstances constituting fraud or mistake." FED.R.CIV.P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir.2006) (quotation marks omitted). An FCA complaint "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir.2009) (quotation marks omitted).

---

[1] These are the same counts that were set out in the original Complaint.

2

Because the submission of an actual claim to the government for payment is "the sine qua non " of an FCA violation, *Clausen*, 290 F.3d at 1311, a plaintiff-relator must "plead the submission of a false claim with particularity," *United States ex rel. Matheny v. Medco Health Solutions Inc.*, 671 F.3d 1217, 1225 (11th Cir.2012). To do so, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *Id.*

Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311 (emphasis added). Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

This Court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins*, 470 F.3d at 1358. Providing exact billing data—name, date, amount, and services rendered-or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted. *See, e.g., Hopper*, 588 F.3d at 1326; *Atkins*, 470 F.3d at 1358. However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim. *See Clausen*, 290 F.3d at 1312 & n. 21 (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"); *see also Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir.1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.").

Under this Court's nuanced, case-by-case approach, other means are available to present the required indicia of reliability that a false claim was actually submitted. Although there are no bright-line rules, our case law has

indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims. *See U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir.2005) (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices with the defendant's office manager formed the basis for the relator's belief that claims were actually submitted to the government).

By contrast, a plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation. *See Atkins*, 470 F.3d at 1359 (holding that Rule 9(b) was not satisfied where the relator was a doctor who did not allege first-hand knowledge of the hospital's submission of false claims). Additionally, a corporate outsider likely does not have the required access to learn enough about the defendants' billing practices. *See Clausen*, 290 F.3d at 1314 (noting that a corporate outsider's lack of information about the defendants' billing practices makes it more difficult to gather the factual specifics necessary to meet Rule 9(b)'s requirements).

At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013–14 (11th Cir.2005) (finding insufficient indicia of reliability after noting that the relator "did not explain why he believes fraudulent claims were ultimately submitted"). It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, *see id.* at 1014, to base his knowledge on rumors, *see Atkins*, 470 F.3d at 1359, or to offer only conjecture about the source of his knowledge, *see United States ex. rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 n. 4 (11th Cir.2010).

*U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703–05 (11th Cir. 2014).

## III. ALLEGATIONS IN THE AMENDED COMPLAINT

The Amended Complaint, in pertinent part, alleges:

11. Defendant Adams and Associates, Inc. ("Adams") operates and does business as the Gadsden Job Corps Center (the "center") in Gadsden, Alabama. Defendant Adams also operates at least fourteen (14) other, similar facilities in several states. The Gadsden Job Corps Center advertises space for approximately two hundred fifty-six (256) enrolled residential student[s] as well as approximately thirty (30) enrolled non-residential students.

12. Under the auspices of the Gadsden Job Corps Center, [Adams] offers a GED program, a high school diploma through Etowah County Public Schools, career technical training in six (6) vocational areas, and collegiate classes at Gadsden State Community College for certain students. Defendant Adams advertises that the center provides "a full range of services to our students including residential dorms, medical and dental care, career and social counseling, academic and vocational training, transportation and a living allowance."

13. Defendant Adams advertises that the Gadsden Job Corps Center offers Career Technical Training, Academic Opportunities (High School Diploma or GED), Room and Board, Medical and Dental Care, Recreational Activities, Field Trips, Spending Money, Real World Work Experience, Graduation Bonus, and Job Placement Assistance. Defendant Adams advertises that the Gadsden Job Corps Center Offers technical training programs in Advanced Human Services, Carpentry, Culinary Arts, Nurse Assistant/Home Health Aide, Office Administration, and Security & Protective Services. Adams advertises that the Gadsden Job Corps Center offers academic programs in Math & Reading, Mentoring, General Education Diploma (GED), High School Diploma, Community College for Qualified & Motivated Students, English Language Learner (ELL), Tutoring, Study Groups, Counseling, Leadership, and Driver's Education.

14.    Defendant Lorraine Lane is the former Center Director and an agent of defendant Adams and Associates. Defendant Lane was the highest ranking official at the Gadsden Job Corps Center during a portion of the relevant time period. Defendant Lane was the official in charge of all aspects of the Gadsden Job Corps Center including enforcement of the statutory "zero tolerance" policy prohibiting drug use and violence described herein.

15.    Defendant Viera is the CSIO[2] Supervisor and an agent of defendant Adams and Associates. Defendant Viera was the official in charge of discipline of student enrollees including enforcement of the statutory "zero tolerance" policy prohibiting drug use and violence described herein.

16.    Defendant Adams is an "operator and service provider" who has entered into an agreement with the U.S. Department of Labor pursuant to 29 U.S.C. §3197 and receives approximately $27,000 per enrollee annually. Defendant Adams is paid based upon anticipated enrollment and has to return or take a credit against future payments for each slot for each enrolled student which is not filled by an enrolled student or which is vacated when an accepted enrolled student leaves the center for any reason. In order to qualify, defendant Adams was required to submit certify [sic] that it provided the services required by the Job Corps Act[3] and to further certify that it complied with the material provisions of the act. In particular, Section 3197 requires an "[assurance the entity will comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.]"[4]

_____

[2] The acronym "CSIO" is not defined in the Amended Complaint.

[3] The Court notes that provisions concerning the Job Corps are now codified at 29 U.S.C. §§3191-3212.

[4] The Court notes that the statute, in context, provides:

To be eligible to operate a Job Corps center, an entity shall submit to the Secretary, at such time and in such manner as the Secretary may require, information related to additional selection factors, which shall include . . . [a]n assurance the entity will

17. 29 U.S.C. § 3202(a) requires the Secretary and directors of Job Corps to "stringently enforce standards of conduct within the centers . . . [which] shall include provisions forbidding" acts of violence and the use, sale, or possession of a controlled substance or alcohol.[5]

18. Section 3202(b) requires the director to dismiss an enrollee from the Job Corps, *inter alia*, if the director determines retention jeopardizes the enforcement of standards and specifically establishes a "zero tolerance" policy for the certain infractions, including "an act of violence, for use, sale, or possession of a controlled substance, for abuse of alcohol, or for other illegal or disruptive activity." Section 3202(b)(2)(ii) states "'zero tolerance' means a policy under which an enrollee shall be automatically dismissed from the Job Corps after a determination by the director that the enrollee has carried out an action" which specifically includes, (1) an act of violence, (2) the use, sale or possession of a controlled substance, or (3) abuse of alcohol.[6]

---

comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.

29 U.S.C.A. § 3197(a)(3)(J).

[5] The Court notes that the statute provides:

The Secretary shall provide, and directors of Job Corps centers shall stringently enforce, standards of conduct within the centers. Such standards of conduct shall include provisions forbidding the actions described in subsection (b)(2)(A).

29 U.S.C.A. § 3202(a).

[6] The Court notes that the statute provides:

**(b) Disciplinary measures**

**(1) In general**

To promote the proper behavioral standards in the Job Corps, the directors of

Job Corps centers shall have the authority to take appropriate disciplinary measures against enrollees if such a director determines that an enrollee has committed a violation of the standards of conduct. The director shall dismiss the enrollee from the Job Corps if the director determines that the retention of the enrollee in the Job Corps will jeopardize the enforcement of such standards, threaten the safety of staff, students, or the local community, or diminish the opportunities of other enrollees.

**(2) Zero tolerance policy and drug testing**

**(A) Guidelines**

The Secretary shall adopt guidelines establishing a zero tolerance policy for an act of violence, for use, sale, or possession of a controlled substance, for abuse of alcohol, or for other illegal or disruptive activity.

**(B) Drug testing**

The Secretary shall require drug testing of all enrollees for controlled substances in accordance with procedures prescribed by the Secretary under section 3195(a) of this title.

**(C) Definitions**

In this paragraph:

**(i) Controlled substance**

The term "controlled substance" has the meaning given the term in section 802 of Title 21.

**(ii) Zero tolerance policy**

The term "zero tolerance policy" means a policy under which an enrollee shall be automatically dismissed from the Job Corps after a determination by the director that the enrollee has carried out an action described in subparagraph (A).

29 U.S.C.A. § 3202(b).

19.     29 U.S.C. § 3195 requires the Secretary to establish specific standards and procedures, which "at a minimum . . . [include] informing enrollees that drug tests will be administered to the enrollees and the results received within 45 days after the enrollees enroll in the Job Corps."[7]

20.     The center is therefore required to administer drug tests to new enrollees upon enrollment and is required by statute to expel any enrolled student who tests positive for the use of a controlled substance after 45 days.[8] The center is also required by statute to expel any enrolled student if the enrolled student is found to use, sell or possess any controlled substance at any time after enrollment.

_____

[7] The Court notes that the statute provides:

**(a) Standards and procedures**

**(1) In general**

The Secretary shall prescribe specific standards and procedures for the recruitment, screening, and selection of eligible applicants for the Job Corps, after considering recommendations from Governors of States, local boards, and other interested parties.

**(2) Methods**

In prescribing standards and procedures under paragraph (1), the Secretary, at a minimum, shall--

(A) prescribe procedures for informing enrollees that drug tests will be administered to the enrollees and the results received within 45 days after the enrollees enroll in the Job Corps[.]

29 U.S.C.A. § 3195(a)(1)-(a)(2)(A).

[8] The Court notes that the way this sentence reads, an enrollee would only be expelled for a positive drug test result obtained more than 45 days <u>after</u> his or her enrollment. The 45-day period in the statute refers to the deadline when test results must be <u>received</u>. The Court reads the statute as providing a zero tolerance policy for drug use, <u>whenever</u> it is discovered.

21.     Section 3202 prohibits the use of controlled substances. Section 3195 requires the center to administer drug tests at enrollment and again within 45 days in order to enforce a zero tolerance policy against continued drug use by enrolled students.[9] The U.S. Department of Labor Office of Job Corps Policy and Requirements Handbook requires that each student be tested for controlled substances at the time of admission and then re-tested at an interval between and 40 days after an initial positive test.[10] The handbook also requires that an enrolled student must be tested on suspicion of use of a controlled substance at any time.

22.     Section 3202 prohibit[s] acts of violence. This section states the standards of conduct shall include "zero tolerance" for acts of violence and requires the director to dismiss any enrollee from the Job Corps who commits and [sic] act of violence.

23.     The plaintiff/relator was employed by defendant Adams from approximately March 3, 2014[,] until approximately August 26, 2015.[11] During his employment, Mr. Headen was aware that defendant Adams did not follow the statute and failed to administer drug tests as required. Mr. Headen was also aware that defendant Adams ignored drug use including failing to administer tests as required or by ignoring positive drug tests in violation of federal statute.

24.     All of the funds Defendant Adams received for all of the students in the program came from the federal government through the Department of Labor. There were no state, county or local funds which paid for the students to attend or participate in the program. There were no charitable funds which paid for the students to attend

---

[9] As noted by this Court, *supra* note 8, that is not what the statute says.

[10] The Court notes that the Relator provides no citation for this allegation, which, because it calls for additional testing "40 days after an initial positive test," implies that there is in fact no "zero tolerance" policy.

[11] The Court notes that neither here, nor elsewhere in the Amended Complaint, does the Relator state in what capacity he was employed by Adams, or what his job duties entailed.

or participate in the program. Defendant Adams did not offer scholarships or tuition waivers since the students were not required to pay any tuition, which was paid by the federal government.

25. Funding and enrollment levels were openly discussed at Adams, including by defendant Lane, who emphasized the need to keep numbers up as close as possible to the maximum of 290. The students enrolled were listed on a roster which was distributed every day. The plaintiff/relator and other employees conducted several head counts daily which were used to produce the roster. Students who were on sick leave continued to be listed on the roster, which meant Adams was being paid by the federal government as if they were enrolled. Adams would list students who were commuters on the roster as if they were enrolled from time to time, depending upon where the actual number of on campus students happened to be.

26. The plaintiff/relator had specific personal knowledge that defendant Adams, by and through its agents Lane, Viera and others, intentionally ignored the statutory "zero tolerance" policy against acts of violence, drug use and alcohol abuse.

27. The plaintiff/relator had specific personal knowledge that defendant Adams, by and through its agents Lane and others, claimed that enrolled students who had left the program were actually present and attending programs after these students had actually left the program. The plaintiff/relator had specific personal knowledge that defendant Adams claimed enrolled students were using residential facilities after they had moved out and were no longer enrolled or residents.

28. Defendant Adams, through Lane and Viera, had a policy and practice of failing to drug test, ignoring positive drug tests, and/or ignoring obvious drug use throughout the relevant time period. Nicholas Johnson and NeQuia Underwood were two students who were obviously using drugs and/or abusing alcohol during their enrollment, but that drug use and alcohol abuse was ignored by defendant Lane. When issues with Nicholas came up, Lane would instruct staff not to file a case not because that would create a paper

record of the issue. Nicholas Johnson was allowed to remain enrolled until May or June 2015, when he was finally expelled from the program after multiple instances of fighting.

29. Defendant Adams, through Lane and Viera, had a policy and practice of ignoring and failing to document acts of violence throughout the relevant time period. Students Rashawn Lockley, Jamal Morgan, Brian James, KenDarius Birmingham, Jessie Rollins, James Spearman, Daryl Page, Johnny Ward, Quentin Slaughter and Nicholas Johnson had multiple instances of fighting during their enrollment. These issues were not documented based on direct instruction from defendant Lane. Lane instructed the staff to alert her about any instances of fighting before filing a written case note. When staff alerted her to instances of fighting, including instances involving these specific students, Lane instructed staff not to create a case note about the incidents. Daryl Page and Johnny Ward were still enrolled as students when Headen was terminated. Quentin Slaughter was eventually expelled but was allowed to remain because, according to defendant Lane, the student numbers were low at the time. Nicholas Johnson was eventually expelled in May or June 2015, but only after multiple instances of violence.

30. Defendant Adams, through Lane, had a policy and practice of claiming that enrolled students who had left the program were actually present and attending programs after these students had actually left the program. Headen and other employees were routinely sent on trips across the state to pick up students who did not return to the campus after the weekend. Often, these students had informed Lane, or her assistant Epiphany Cherry, that they did not intend to return. Headen and other employees were sent in an Adams vehicle to contact the students and at times to convince them to return to the campus. Many times, Headen and other employees, such as Ross Arrington, were told to offer these students paying jobs if they would come back. However, some students refused to return at all and were then listed as being on sick leave while still on the roster. Students who refused to return were carried for seven (7) days, and at times even longer, on the roster which meant that Adams was being paid by the federal government as if they were present.

One student, Timothy Bradham, who was from the Troy, Alabama area, informed Adams, and Cherry, that he was leaving the center. Mr. Headen and another employee were sent to attempt to convince Bradham to return. Bradham refused to return, and told Mr. Headen. Mr. Headen in turn told Cherry and Lane that Bradham refused to return. Despite Bradham's refusal to return, Bradham was listed on the roster for the following week as if her [sic] were on sick leave. Bradham was eventually dropped from the roster after seven (7) days, when a new group of students would arrive.

31. Defendant Adams, through defendant Lane, terminated Mr. Headen on or about August 26, 2015. Defendant terminated Mr. Headen, supposedly for using inappropriate and unprofessional language in a text message he sent to NeQuia Underwood, who was his wife's cousin, from his cell phone to her cell phone during hours when he was not at work and she was not on campus.

32. Mr. Headen had several conversations with NeQuia Underwood, his wife's cousin and an enrollee in the Gadsden Job Corps program. Upon information and belief, Ms. Underwood tested positive for controlled substances when she enrolled in the Gadsden Job Corps program. Ms. Underwood continued to abuse alcohol and to use controlled substances while she was enrolled. Defendant Adams, through Lane, Viera and other agents, ignored Ms. Underwood's repeated alcohol abuse and continued drug use, failed to drug test Ms. Underwood, and/or, in the alternative, ignored positive drug tests. Mr. Headen learned that Ms. Underwood had been using drugs and continued to use drugs while enrolled in the Job Corps program.

33. Upon information and belief, defendant Adams continues to operate in the same manner under current Center Director Levros. Former Director Lane was promoted to a position of greater authority and now supervises the Gadsden Job Corps Center as well as other Job Corps centers owned and operated by defendant Adams.

(Doc. 41 at 5-15, ¶¶11-33).

## IV. ANALYSIS

### A. <u>Count One</u>

Count One alleges that the Defendants are liable for violation of 31 U.S.C. §§3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). Those sections impose liability on "any person who[:] . . . (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . . (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [and] . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. §§3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). The court will address each subsection in turn.

#### 1. *The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Presented, or Caused To Be Presented, a False or Fraudulent Claim for Payment or Approval [31 U.S.C. §3729(a)(1)(A)]*

The Amended Complaint alleges two separate violations of this subsection of the FCA: 1) the continued enrollment of students who violated the "zero tolerance" policy; and 2) the creation of inaccurate rosters of students.

##### a. Failure to Follow "Zero Tolerance" Procedures

The Amended Complaint first alleges that the Defendants failed to follow statutory

"zero tolerance" procedures by: failing to administer drug tests as required (doc. 41 at 10, ¶23), and failing to expel enrollees who engaged in violence, or participated in the use, sale, or possession of a controlled substance or alcohol. (Doc. 41 at 11, ¶26). The Amended Complaint includes the names of several students who allegedly violated the policy and were not expelled. (*See* doc. 41 at 11-12, ¶28 (Nicholas Johnson and NeQuia Underwood– drugs and alcohol); doc. 41 at 12-13, ¶29 (Rashawn Lockley, Jamal Morgan, Brian James, KenDarius Birmingham, Jessie Rollins, James Spearman, Daryl Page, Johnny Ward, Quentin Slaughter, and Nicholas Johnson–fighting)). The Relator further alleges that the federal government is the only source of funding for Adams (doc. 41 at 10, ¶24), and that Adams "is paid based upon anticipated enrollment and has to return or take a credit against future payments for each slot for each enrolled student which is not filled by an enrolled student or which is vacated when an accepted enrolled student leaves the center for any reason" (doc. 41 at 7, ¶16). The Relator alleges that "[f]unding and enrollment levels were openly discussed at Adams, including by defendant Lane, who emphasized the need to keep numbers up as close as possible to the maximum of 290." (Doc. 41 at 10, ¶25).[12]

---

[12] The gist of the Relator's argument is that Adams did not expel students because every student it lost would mean less money for it. The Relator argues that Adams was paid based on enrollees, but then insists that it should not have been paid for enrollees who should have been expelled. The Relator never explains why, if payment was based on enrollment alone, and enrolled students received Jobs Corps services, a claim for payment for these students would be "false." Whatever other consequences there might be to Adams for keeping such students enrolled, the Amended Complaint does not state that the Defendants failed to provide all of the services for

None of these factual allegations set out a violation of the Act.[13] "Liability under the False Claims Act arises from <u>the submission of a fraudulent claim to the government</u>, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello*, 428 F.3d at 1012 (*citing Clausen*, 290 F.3d at 1309) (emphasis added). Instead, "to state a claim under the False Claims Act with particularity, the complaint must allege facts as to time, place, and substance of the defendant's alleged fraud, [and] the details of the defendants' allegedly fraudulent acts, when they occurred,

_____

which the government contracted. Regardless, as shown *infra*, the failure to set out any particular claims dooms this allegation.

[13] Nor is it clear that Defendants were actually required to follow the procedures alleged by the Relator. The Relator argues that the Defendants violated 29 U.S.C.A. § 3197(a)(3)(J), which provides:

> <u>To be eligible to operate a Job Corps center</u>, an entity shall submit to the Secretary, at such time and in such manner as the Secretary may require, information related to additional selection factors, which shall include . . . [a]n assurance the entity will comply with basic health and safety codes, which shall include the disciplinary measures described in section 3202(b) of this title.

29 U.S.C.A. § 3197(a)(3)(J) (emphasis added). Section 3202(b), which is referenced in section 3197(a)(3)(J), describes the zero tolerance policy. The plain wording of section 3197(a)(3)(J) clearly applies only to <u>information</u> given to the Secretary in order to be eligible for initial <u>selection</u> as a Jobs Corps center. It does not describe requirements or procedures for <u>payment</u> to established centers. Furthermore, the Amended Complaint pleads the following:

> The U.S. Department of Labor Office of Job Corps Policy and Requirements Handbook requires that each student be tested for controlled substances at the time of admission and then re-tested at an interval between and 40 days after an initial positive test. The handbook also requires that an enrolled student must be tested on suspicion of use of a controlled substance at any time.

(Doc. 41 at 9, ¶21). As noted *supra* note 10, this allegation undercuts the Relator's argument by implying the absence of a zero tolerance policy.

and who engaged in them. *Corsello*, 428 F.3d at 1012; *see also Clausen*, 290 F.3d at 1308 ("Rule 9(b) prevents '[s]peculative suits against innocent actors for fraud,' and. . . under Rule 9(b) allegations of fraud 'must include facts as to time, place, and substance of the defendant's alleged fraud.'") (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566–67 (11th Cir.1994)). The Amended Complaint only alleges, generally, that the Defendants submitted "false and fraudulent claims, records, and statements" (doc. 41 at 15, 17, ¶¶36, 44). It does not identify, for example, the titles of the forms or reports Adams submitted to the government for payment, how often they were submitted, or who submitted them.[14] Also, the Relator has neither produced, nor referenced in his Amended Complaint, specific billing data evidencing any such claims, records, and statements.[15] Furthermore, the Amended Complaint contains no facts which establish that the Relator would have had direct, first-hand knowledge of the Defendants'

---

[14] The Court gives no weight to the generalized allegations, found throughout the Complaint, that vaguely refer to false claims which were submitted by Lane, or "the defendants." No specific false claims have been pleaded.

[15] The Relator correctly notes that "the Eleventh Circuit only requires that a complaint 'contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis.'" (Doc. 48 at 9) (*quoting Clausen*, 290 F.3d at 1310-11). He then argues:

> The plaintiff has satisfied this standard by alleging that (1) all funding came from the government, (2) that the source of funding and the need to keep enrollment maximized was openly discussed, (3) that such discussions clearly related to the violations the plaintiff actually witnessed and (4) identifying specifically the students kept as enrolled despite these violations.

(Doc. 48 at 10). None of these allegations establish, with particularity, that <u>a false claim was made</u>.

submission of false claims gained through his employment with the Defendants. Indeed, the Amended Complaint fails to even identify in what capacity the Relator was employed by Adams.[16]

The Relator attempts to circumvent the requirement of particularity by pleading, and arguing, that a false claim must have been made, since the only source of funds for Adams was the government. *See* doc. 48 at 8 ("Those specific factual allegations clearly allege that it was common knowledge that the federal government was the sole payer for enrolled students and that employees were told to take steps ensure that enrollment was kept at the maximum") (citing doc. 41 at 10, ¶¶24-25); doc. 48 at 11 ("The plaintiff's Amended Complaint likewise alleges that these false rosters were submitted to the federal government, since the federal government was the sole source of funds for the program") (citing doc. 41 at 7-8, 10-11, ¶¶16, 24-25); doc. 48 at 12 ("the plaintiff alleged it was openly discussed that the federal government was the sole source of funds for the Gadsden Job Corps Center and provided specific factual allegations about the role of the individual defendants in perpetrating that fraud" (citing doc. 41 at 3-4, 5-11, ¶¶4-7, 11-27; doc. 48 at 13 ("In this case the plaintiff not only alleged that fraudulent practices

---

[16] The Defendants contend that his job title was "Dorm Supervisor." (Doc. 46 at 7). The Court need not determine whether someone employed in that capacity is a "corporate outsider," since the Plaintiff-Relator, who is the master of his Amended Complaint, has failed to allege facts establishing that he was a "corporate <u>insider</u>," or learned of the billing practices, <u>and the submission of false claims</u>, through his employment with Adams.

occurred, but also clearly connected those payments to the federal government as the sole source of funds for the program") (citing Doc. 1 ¶¶18, 25-30); doc. 48 at 14 ("The plaintiff's Amended Complaint likewise alleges that both false statements resulted in payment by the federal government, since the federal government was the sole source of funds for the program.") (citing doc. 48 at 7-8, ¶¶16). The Relator has cited no authority, and the Court has found none, for the proposition that the existence of only one payer, without more, establishes that a false claim was made. Indeed, the Court has found no cases which have addressed the issue either way. However, it is often the case that, even when the government is the only payer, the Eleventh Circuit finds the allegations of a false claim to be lacking in particularity. *See, e.g., Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718 (11th Cir. 2012) (relator's allegation of violations of government construction contracts not relevant to whether defendant submitted fraudulent claims related to those contract violations); *Jallali v. Nova Se. Univ., Inc.,* 486 F. App'x 765, 765 (11th Cir. 2012) (relator's allegation that college falsely asserted compliance with federal regulations in submitting claims for federal student aid to federal government lacked specificity required by Rule 9). The Relator asks this Court to <u>infer</u> the existence of a false claim, something it cannot do. *See*, *Corsello*, 428 F.3d at 1013 ("Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims because such an

assumption would 'strip[ ] all meaning from Rule 9(b)'s requirements of specificity.'") (quoting *Clausen*, 290 F.3d at 1312 n. 21).

The facts of this case are very similar to the facts in *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718 (11th Cir. 2012). In that case, the defendant, Bell, was awarded two government contracts by the United States Army Corps of Engineers for the construction of a pump station and levees. The procedures under which Bell was paid required it to submit to the government a monthly request for payment and to certify, in each monthly invoice, that the payment requested was for work performed according to the contract's specifications. The relators alleged that some of the work Bell did failed to comply with the contractual specifications, and that the defendant billed the government for non-compliant work. The Eleventh Circuit affirmed the district court's dismissal, writing:

> Here, Relators' allegations fail to show that Bell's monthly invoices actually included a false or fraudulent request for payment. Although Relators allege details as to how Bell violated its contracts, and allege some details as to when the monthly invoices were submitted, Relators fail to establish that the contract violations actually resulted in the submission of false claims. *See Atkins*, 470 F.3d at 1359 (concluding relator failed to establish a link between detailed allegations of improper practices and the actual submission of false claims relating to those violations). Relators merely speculate that because Bell violated the contract in some instances, and because Bell submitted some invoices, false claims "must have been submitted, were likely submitted or should have been submitted...." *Clausen*, 290 F.3d at 1311. Assuming arguendo that Bell violated the contract and requested payment under the contract, this does not show that Bell's monthly invoices actually billed for the non-compliant work, and we

decline to make such an assumption. *See id.* at 1312 n. 21 ("We cannot make assumptions about a False Claims Act defendant's submission of actual claims...."). Thus, the Complaint, despite the inclusion of some detailed factual allegations, has failed to sufficiently plead that Bell's submissions included an actual false or fraudulent claim.

Moreover, Relators lack the type of knowledge that normally will support an FCA complaint. *See United States ex rel. Walker v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir.2005) (noting that knowledge developed from relator's employment by the defendant and conversations with billing employees can support a FCA complaint). Although Relator Gene Klusmeier alleges he was present on the construction site and observed some of the contract violations, his personal knowledge of the contract violations is not relevant to whether Bell submitted fraudulent claims related to those contract violations. *See id.* (finding personal knowledge of billing practices relevant to allegations of false bills); *see also Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 Fed.Appx. 893, 895 (11th Cir.2008) (holding that relator's first-hand knowledge of billing practices could not support relator's allegation that the services related to the bills were performed improperly). Thus, Relators' personal knowledge of the contract violations does not support the allegation that Bell submitted requests for non-compliant work.

*Id.* at 721–22.

Another Eleventh Circuit opinion, *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 766 (11th Cir. 2012), is also instructive. In *Jallali*, the Eleventh Circuit, finding *Klusmeier* persuasive, wrote:

In this case, Jallali[,] [the Relator][,] alleges that Nova Southeastern failed to comply with 34 C.F.R. § § 602.22 and 668.14.1 He further alleges that federal regulations required Nova Southeastern to certify compliance with § § 602.22 and 668.14 each time it requests federal student aid payments. Finally, he alleges that Nova Southeastern did request federal student aid payments. But, these allegations do not satisfy Rule 9(b) under our precedent. Jallali's complaint does not allege facts identifying the time,

21

place, or substance of the allegedly fraudulent claims for payment. The complaint does not allege facts showing that Nova Southeastern actually certified compliance with § 602.22 and 668.14. Nor does the complaint allege that noncompliance with these regulations renders Nova Southeastern ineligible to receive federal student aid payments. Nor does Jallali possess personal knowledge of Nova Southeastern's billing practices.

> We see no substantive distinction between *Klusmeier* and this case.

*Jallali*, 486 F. App'x at 767.

Similarly, in *Britton ex rel. U.S. v. Lincare Inc.*, 634 F. App'x 238, 240 (11th Cir. 2015),

> The relator, Willie Britton, was employed as a delivery person for defendant Lincare. Britton delivered nebulizers to Lincare patients, explained the doctor's prescription, and demonstrated proper breathing technique while operating the nebulizer. Lincare's internal guidelines, however, provide that these explanations and demonstrations are to be performed by a "clinician only." Britton has no respiratory training or certification to credential him as a clinician. The assistance he provided, Britton claims, should have been performed by a "Health Care Specialist," such as a Licensed Practical Nurse, Registered Respiratory Therapist, or Certified Respiratory Therapist. Britton says that Lincare is forced to rely on delivery personnel like him to complete these educational tasks because its one Licensed Healthcare Representative in the Birmingham area is unable to serve all of Lincare's clients.

*Britton*, 634 F. App'x at 239. The Eleventh Circuit affirmed the dismissal of the relator's claims, writing:

> Here, Britton's complaint alleges that he performed services that Lincare's internal documents reserved for clinicians. However, "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result

of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311. Britton is unable to muster any facts tending to show that Lincare asked the Government to pay amounts it does not owe. He disclaims any knowledge of Lincare's billing practices, and does not allege the "who," "what," "where," "when," and "how" of fraudulent submissions to the government. Nor does Britton allege that the United States actually paid a false claim, or that Lincare intended for the government to rely on false statements in deciding whether to pay a false claim. *See Hopper*, 588 F.3d at 1329–30 (holding that actual payment of a claim is an element of § 3729(a)(2), and dismissing the relator's action because even if actual payment need not be pled with particularity, the complaint failed to allege that the defendants intended for the government to rely on their false statements in deciding whether to pay a false claim).

*Id.* at 240–41; *see also*, *Atkins*, 470 F.3d at 1359 ("As the plaintiff did in *Clausen*, Atkins has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims. He cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement. Just like the *Clausen* plaintiff, though, Atkins fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.") (emphasis in original). The Court sees no distinction in the allegations in the instant case and these cases.[17]

_____

[17] Both sections of the FCA under which Relator's claim purportedly arises require proof of scienter. *See* 31 U.S.C. ¶3729(a)(1)(A), (B). The Relator's alleges that the Defendants: "knowingly presented and caused to be presented to the United States Government and state governments

Furthermore, assuming Adams was not entitled to reimbursement for these enrollees,[18] the pleadings leave open the possibility that Adams made no claim for payment for <u>those</u> enrollees. The existence of these alternate explanations means that the factual allegations in the Amended Complaint fail to satisfy even the "notice pleading"

---

participating in the Job Corps program, false and fraudulent claims, records, and statements" (doc. 41 at 15, ¶36); "defendants and their agents and employees knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid" (doc. 41 at 15, ¶37); "defendants and their agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease defendants' obligation to repay money to the United States Government that defendants improperly and/or fraudulently received" (doc. 41 at 16, ¶38). These threadbare allegations, which find no factual support anywhere in the Amended Complaint, are insufficient allegations of scienter under Rule 8. *See U.S. ex rel. Barrett v. Beauty Basics, Inc.*, No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *5 (N.D. Ala. June 11, 2015) (Blackburn, J.) (factually unsupported allegation that "with full knowledge that [it] did not meet the requirements for accreditation under NACCAS standards, [defendant] then represented to the United States Department of Education that it met NACCAS standards" insufficient). The Relator argues that Lane

> was the individual in charge of all aspects of the Gadsden Job Corps Center, including the "zero tolerance" policy and the official rosters submitted claiming that students not present were enrolled. Doc. 41 ¶6, 16, 23-30. While the Amended Complaint does not allege a specific date for a specific certification, such specific allegations are not required in order for these allegations to be reliable. The plaintiff's Amended Complaint alleges a policy and practice of these same violations throughout his employment. Id. at 23-30. The plaintiff also alleges Lane was aware that specific students were not eligible but remained in the program for an extended period of time. Id. at 31-32. The plaintiff also alleges that students were moved back and forth between "commuter" status and "resident" status in order to fill vacant slots. *Id*. ¶25. Since funds were dispersed on a periodic basis, these certifications by Ms. Lane as Center Director, along with a description of Ms. Vierra's role as CSIO Supervisor in charge of discipline, are reliable and sufficient to plead scienter.

(Doc. 48 at16-17). Assuming that these allegations establish the Defendants' knowledge that regulations were not being followed, or rosters were being inflated, none of these facts establish that any Defendant knew that <u>a false claim was being submitted.</u>

[18] Which, as discussed *supra* note 12, it not at all clear in the Amended Complaint.

standard of Rule 8. *See Twombly*, 550 U.S. at 567 (noting that where there was "an obvious alternative [and legal] explanation" for the conduct alleged the plaintiffs had not "nudged their claims across the line from conceivable to plausible"); *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013) ("[W]hen a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment."; "[W]ithout such plausible allegations of presentment, a relator not only fails to meet the particularity requirement of Rule 9(b), but also does not satisfy the general plausibility standard of *Iqbal*.") (italics in original).

### b.     Inflated Rosters

The Amended Complaint also alleges that the Defendants "claimed that enrolled students who had left the program were actually present and attending programs after these students had actually left the program," and "claimed enrolled students were using residential facilities after they had moved out and were no longer enrolled or residents." (Doc. 41 at 11, ¶27). In his brief, the Relator argues:

> In this case, the plaintiff has alleged all payments for every student come from the federal government, which does not appear to be the subject of reasonable dispute. Doc. 41 ¶16. In addition, in the Amended Complaint, the plaintiff further alleged that no state, local or private funds were received to support student enrollment. *Id*. ¶24. Finally, the plaintiff has alleged that the source of funding and enrollment levels were openly

discussed and were discussed in a context which clearly related federal government funding to the policy violations which the plaintiff witnessed. *Id.* ¶25. The rosters, which the plaintiff participated in developing several times daily, were known to be the documents which triggered payment and employees were instructed as such. *Id.* These allegations have sufficient indicia of reliability in this case on a motion to dismiss.

        The plaintiff's Amended Complaint also alleges with particularity that these rosters showed that (1) the defendants falsely claimed specific students were enrolled when they were not, that (2) the defendants ignored the "zero tolerance" statutory requirement and allowed ineligible students to remain enrolled, and (3) the defendants had a consistent policy and practice of these types of violations throughout his employment. Doc. 41 ¶¶23-30. The plaintiff's Amended Complaint likewise alleges that these false rosters were submitted to the federal government, since the federal government was the sole source of funds for the program. *Id.* ¶¶16, 24-25.

(Doc. 48 at 10-11). In sum, unlike the "zero tolerance" allegations, in these allegations the Relator actually alleges that the Defendants were paid based on enrollment figures, and those enrollment figures were inflated. Furthermore, he claims that he took part in the creation of these inflated rosters.

This claim fails for some of the same reasons the zero tolerance claim failed. First, there is <u>no</u> allegation in the Amended Complaint that any rosters were ever presented to the government for payment. For that reason alone, any claim that payment was based upon the creation of false rosters fails. Second, even if there were such allegations, there are no specifics as to when a roster was presented to the government,

by whom, for what amounts, etc. Accordingly, the claim fails to satisfy Rule 9(b).[19]

> **2.** **_The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Made, Used, or Caused To Be Made or Used, a False Record or Statement Material to a False or Fraudulent Claim [31 U.S.C. §3729(a)(1)(B)]_**

This claim, which is based on the same facts as the claim under subsection A, fails for the same reasons the previous claim failed.

> **3.** **_The Realtor Fails To Allege with Sufficient Particularity that the Defendants Knowingly Made, Used, or Caused To Be Made or Used, a False Record or Statement Material to an Obligation To Pay or Transmit Money or Property to the Government, or Knowingly Concealed or Knowingly and Improperly Avoided or Decreased an Obligation To Pay or Transmit Money or Property to the Government [31 U.S.C. §3729(a)(1)(G)]_**

In the instant case, the Relator argues:

> The plaintiff's Amended Complaint alleges funds were provided by the federal government to [Adams] on a rolling basis. Doc. 41 ¶16. Therefore, at scheduled intervals, [Adams], through Director Lorraine Lane, would have to account for students who left the program early, but for whom [Adams] had already been paid. _Id_. ¶¶24-25, 30. Therefore, [Adams] would be required to repay monies receive or not receive more money for future use. _Id_. ¶25. Therefore, the plaintiff is alleging that false statements were either false claims when submitted or reverse false claims if not accounted for at each accounting period. _Id_. ¶¶42-49[.]

(Doc. 48 at 17). This type of claim is sometimes called a "reverse false claim." It too must meet Rule 9(b)'s heightened pleading standard. _Matheny_, 671 F.3d at 1222. As

---

[19] Furthermore, the Relator does not explain under what rule or regulation rosters are submitted by jobs corps centers for payments. Neither the jobs corps statutory provisions (29 U.S.C. §§3191-3212), nor the regulations concerning same (20 C.F.R. Part 670) discuss "rosters".

shown above, the Relator has failed to allege with particularity that Adams sought

payment based on enrollment in the first place, let alone for enrollees who were not

enrolled, or failed to repay money it received for enrollees who subsequently left.

The Relator cites to *Matheny* for the proposition that "'[a]n express contractual

obligation to remit excess government property is a definite and clear obligation for FCA

purposes.'" (Doc. 48 at 18) (*quoting Matheny*, 671 F.3d at 1223). Importantly, however,

the *Matheny* court also wrote:

> Here, the Complaint contains detailed allegations relating to the
> Defendants' contractual obligation to identify, report, and remit excess
> government money in accordance with the CIA's instructions. . . . Relators
> have alleged an express contractual obligation on behalf of the Defendants
> to remit Overpayments within thirty days of identification and defined that
> obligation in detail with references to particular contract sections. These
> factual allegations are sufficient to plead with particularity the existence
> of an obligation to pay money to the government.

*Matheny*, 671 F.3d at 1223–24. Unlike *Matheny*, in the instant case the Relator has pled

no facts establishing that he would be in a position to know how the Defendants were

paid, or identifying any particular payment, or failure to return same. He merely returns

to his same refrain that there <u>must</u> be an overpayment because the government was the

only source for payment. (Doc. 48 at 18) ("There is no such difficulty [in identifying the

overpayment] in this case, since all funds for every student for every purpose were paid

by the federal government."). This claim too fails to satisfy the requirements of Rule

9(b).

## B.     Count Two

Count Two is entitled "Implied False Certification in Violation of the False Claims Act." (Doc. 41 at 17). As the Supreme Court has noted:

> According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A).

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1995, 195 L. Ed. 2d 348 (2016).[20] "[T]he implied certification theory can be a basis for liability . . . where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc.*, 136 S. Ct. at 2001.

Count Two alleges that the Defendants

> falsely implied and/or certified that they complied with applicable statutory, regulatory and contractual requirements and knowingly presented

---

[20] The Defendants note: "False certification is not an independent basis for relief; rather it is a species of the explicit false claims prohibited by statute." (Doc. 46 at 17) (citing *United States v. Beauty Basics Inc.*, No. 2:13-CV-1989-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (Hopkins, J.)). The Relator responds that this theory was set out as a separate claim "out of an abundance of caution." (Doc. 48 at 18). He also notes, correctly, that under Rule 8(a) and (d) he is allowed to plead in the alternative. *Id.* The Court addresses the theory as merely another method of making a claim pursuant to 31 U.S.C. § 3729(a)(1)(A).

and caused to be presented to the United States Government and state governments participating in the Job Corps program, false and fraudulent claims, records, and statements in order to obtain reimbursement for various services provided pursuant to 29 U.S.C. §3191 et seq.

(Doc. 41 at 17, ¶44). In his brief, the Relator alleges that the Defendants

submitted documents which certified to the federal government that it had proper procedures in place to ensure that it followed the statutory scheme and . . . that defendant [Adams], in fact, followed the statutory scheme as required. The plaintiff's certification theory is based on the simple idea that if the Gadsden Job Corps Center was not eligible to receive any payments at all from the federal government, then all receipts for all students were fraudulent.

(Doc. 48 at 19) (internal citations omitted).

As discussed previously, it is not clear from the allegations in the Amended Complaint that the Defendants were required to comply with any of the statutes set out therein. Even if they were, "[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (internal quotations and citations omitted). Again, the Relator has failed to satisfy Rule 9(b)'s requirement to plead these claims with particularity. Count Two is due to be dismissed.

## C.    Count Three

Count Three alleges that the Defendants engaged in a conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C). "To state a claim [for conspiracy to violate the FCA], the plaintiff must show (1) that the defendant conspired with one or

more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello*, 428 F.3d at 1014 (internal quotations and citations omitted). Rule 9(b) applies to this claim as well. *Id.* For the same reasons the other claims failed, this claim does as well. The Relator has failed to plead any of the elements of the conspiracy claim with particularity.[21,22] Count Three is due to be dismissed.

## V.    CONCLUSION

Based on the foregoing, the Motion To Dismiss is due to be **GRANTED**, and this

---

[21] The Relator notes in his brief that "funding and enrollment were openly discussed" and the federal government was the only source of funds. (Doc. 48 at 21). These allegations do not establish, even under notice pleading standards, an agreement to conspire to defraud the government.

[22]    In addition to failing to satisfy Rule 9(b), the conspiracy claim must be dismissed because the underlying FCA claims are due to be dismissed.  As one court has noted:

> [S]econdary liability for conspiracy [for conspiracy to violate the FCA] cannot exist without a viable underlying claim. The FCA provides . . . that any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ... is liable to the United States Government for a civil penalty[.]" Liability for conspiracy under the FCA is governed by traditional notions of civil conspiracy. *See United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991) (containing general discussion of civil conspiracy in FCA context).

*U.S. ex rel. Coppock v. Northrup Grumman Corp.*, No. CIV.A. 3:98-CV-2143-, 2003 WL 21730668, at *14 (N.D. Tex. July 22, 2003).  The Court finds this logic persuasive, and adopts it.

case **DISMISSED with prejudice.**[23] A Final Order will be entered.

      **DONE** and **ORDERED** this 5th day of December, 2017.

                    **VIRGINIA EMERSON HOPKINS**
                    United States District Judge

---

[23] The Relator has not requested leave to amend. Even if he had, the Court notes that he has already amended once.